## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

THE JOHNS HOPKINS HEALTH :
SYSTEM CORPORATION, ET AL :
           :
  v.        :  CIVIL NO. CCB-04-3286
           :
AL REEM GENERAL TRADING :
& COMPANY'S REP. EST.  :
         ...o0o...

## MEMORANDUM

The Johns Hopkins University, The Johns Hopkins Health System Corporation and Johns

Hopkins International filed this suit against Al Reem General Trading & Company's Representation

Establishment on October 8, 2004, seeking both a declaratory judgment that a 1998 Business

Development Agreement is invalid and damages for Al Reem's breach of the implied covenant of good

faith and fair dealing related to their 1999 Business Development Agreement.  Al Reem's motion to

dismiss, or in the alternative, to stay proceedings, and Hopkins' motion for leave to file a sur-reply

memorandum in opposition to Al Reem's motion are pending.  This matter has been fully briefed and

oral arguments were heard on June 7, 2005.  For the reasons stated below, Al Reem's motion to

dismiss or stay will be denied and Hopkins' motion to file a sur-reply memorandum will be denied as

moot.

## BACKGROUND

Al Reem General Trading & Company's Representation Establishment ("Al Reem") is a United

Arab Emirates ("U.A.E.") company that is principally located in Abu Dhabi, U.A.E., and was

established in 1981.  Al Reem operates in many different industries, including health care.  The

chairman of the board of directors and owner of Al Reem is His Royal Highness Sheikh Saeed Bin

Tahnoun Al Nahayan, a member of the royal family and Executive Council member. (Hopkins' Opp'n Mem., Clark Aff., December 16, 1998 Zarroug letter, Ex. I.)  He is the older son of the Ruler's Representative for Al Ain, the second largest city in Abu Dhabi.  (Id.)  The chairman's father is a powerful member of the royal family, as his first cousin was the recently-deceased President of the U.A.E.  (Id.)  The chairman's aunt was the first wife of the former President and is the mother of the current President of the U.A.E.  (Id.)  Joelle Osias, the wife of Al Reem's Executive Vice President, Manar Zarroug, and a former medical resident at Hopkins, initiated meetings between representatives of Al Reem and Johns Hopkins.[1]  (Hopkins' Opp'n Mem., Osias letter, Ex. C; id., Osias fax, Ex. G.)

On January 29, 1999, Johns Hopkins International, L.L.C. ("JHI") entered into a Business Development Agreement (the "1999 BDA") with Al Reem.  (Al Reem's Mot., Siddiq Aff., 1999 BDA, Ex. 2.)  Pursuant to the agreement, Al Reem agreed to promote Johns Hopkins University, Johns Hopkins Health System Corporation, and JHI (collectively "Hopkins") in the U.A.E. so that medical professionals would refer their patients to Hopkins for treatment.  (Id.)  Al Reem also assented to assist Hopkins in broadening its business activities in the U.A.E.  (Id. at ¶ 3; Siddiq Aff. at ¶ 8; Ex. 2, Zarroug Aff. at ¶ 4.)  Under paragraph 10 of the 1999 BDA, a percentage of the total charges collected by Hopkins from Al Reem referral patients would be set aside.  After various expenses were paid, the rest of the funds that were set aside were to be divided between JHI and Al Reem.  (Siddiq Aff., Ex. 2 at ¶ 10.)

The parties communicated with each other about medical, financial and other issues. (See, e.g.,

---

[1]Osias initiated discussion between Hopkins and Manar Zarroug's father, Captain Elnur Zarroug, who is Al Reem's Deputy President.  (Hopkins' Opp'n, Clark Aff., Osias letter, Ex. C.)

Hopkins' Opp'n Mem., Clark Aff., Osias letter, Ex. C; Hopkins' App. to Opp'n Mem.,

Correspondence, Exs. 3, 5.)  Al Reem representatives also visited Johns Hopkins in Maryland on a

number of occasions in connection with their business relationship.  (Al Reem's Mot., Siddiq Aff.,

Hutchins Dep., Ex. 21 at 48-50.)  Al Reem and Hopkins performed the contract through 1999 and

much of 2000.  (Id., Roda Statement, Ex. 20.)  Al Reem alleges that due to its efforts, Hopkins

acquired a large number of patients and significant revenue from the U.A.E.  (Al Reem's Mot., Ex. 2,

Zarroug Aff. at ¶ 11.)  In addition, Al Reem asserts that it helped  Hopkins garner contracts with

private and governmental institutions, including lucrative deals with Palomar Emirates for Medical

Technology Services and the Well Care Hospital in Dubai.  (Id. at ¶ 12; Siddiq Aff., U.A.E. Lawsuit,

Ex. 3 at ¶ ¶ 8-1, 8-2.)

Dissatisfied with the arrangement, JHI gave notice of non-renewal of the 1999 BDA to Al

Reem on June 16, 2000.  (Hopkins' Opp'n Mem., Greenwald Aff. at ¶ 5; Hopkins' App. to Mem.,

June 16th Letter, Ex. 3 at 20.)  In July 2000, however, Hopkins was advised by Al Reem's counsel that

Al Reem had registered "agency agreements" for Johns Hopkins in the U.A.E.[2] (Hopkins' Opp'n

Mem., Greenwald Aff. at ¶ 6.)  Hopkins alleges that it never received copies of the documents

registered by Al Reem until, on October 28, 2001, government sources gave it a copy of an alleged

BDA, dated September 18, 1998 ("the 1998 BDA").  (Id. at ¶ 8.)

---

[2]The registration process apparently entitles Al Reem to "tens of millions of dollars in fees" for
any Hopkins projects in the U.A.E. (Hopkins' Opp'n Mem. at 8.)  The fees are perpetual.  Hopkins
argues that the registration of the 1999 BDA was not part of any agreement and that Al Reem also
improperly registered the fake 1998 BDA, thereby making it virtually impossible for Hopkins to
terminate it.  (See Hopkins' App. to Mem., U.A.E. Country Commercial Guide, FY 2004, Ex. 10 at
88.)

Hopkins denies the validity of the 1998 BDA, contending that it is an outright forgery.  The

1998 BDA purportedly reflects an agreement between Al Reem and Johns Hopkins University

("JHU") and Johns Hopkins Health System Corporation ("JHHSC") and is substantially identical to an

earlier draft of the 1999 BDA but with one major and several minor exceptions:  paragraph 10 is

significantly different in content, and the 1998 BDA contains typographical errors that were not present

in the draft.  (Al Reem's Mot., Siddiq Aff., 1998 BDA, Ex. 1; Hopkins' Opp'n Mem., Clark Aff.,

Draft BDA, Ex. A.)  Though the language is identical in the two documents, other than paragraph 10,

the 1998 BDA contains typographical errors that were not present in the draft.  For instance, it says

"Steve" instead of "Steven," "Al reem" for "Al Reem," and "MANAGEMTN" for

"MANAGEMENT."[3]  (Id. at ¶ 4, 5.)

While the language and grammar of the document on the whole is consistent, that is not the case

for paragraph 10 of the 1998 BDA.  First, the parties are consistently named Al Reem and Johns

Hopkins throughout the document, but in paragraph 10, Al Reem is called "Al Reem General Trading"

and Hopkins is dubbed "Johns Hopkins Health System Corporation," "subsidiaries partners,"

"subsidiaries, parties," "party subsidiaries," and "her subsidiaries (Partners)."  (Al Reem's Mot., Siddiq

---

[3]In addition, Hopkins notes that the document submitted by Al Reem in this court as the 1998
BDA is different than that filed by Al Reem in the U.A.E. (Al Reem's Mot., Siddiq Aff., 1998 BDA,
Ex. 1 at ¶ 10; Hopkins' Opp'n Mem., Greenwald Aff., Ex. 1 at ¶ 10.) Aside from the compensation
allotment in paragraph 10, discrepancies include the location and appearance of the initials or signatures
of the signing parties at the bottom of each page, spacing of the date at the beginning, lack of underlines
of the word "recitals" and other words on the first page, and an empty space in paragraph 10 instead of
the percentage Al Reem would be compensated.  (Id.)  Also, Al Reem's 1998 BDA submitted to this
court has no notarization whereas the one filed in the U.A.E. did have one from London dated Dec. 1,
1999–more than a year after the BDA was supposedly signed.  (Id.)

Aff., 1998 BDA, Ex. 1 at ¶ 10.)  Similarly, in other sections of the document, words are used to describe numbers and they are followed by the corresponding numbers in parentheses.  In paragraph 10 of the 1998 BDA version filed in the U.A.E. court, however, the opposite is done– it says "5% (Five percent)."  (Hopkins' Opp'n Mem., Greenwald Aff., Ex. 1 at ¶ 10.)  This is not only inconsistent with other provisions in the document but with standard practice.  In a similar departure from customary writing, paragraph 10 refers to the "First Party" as if it were a defined term, even though it is not defined or used in any other provision of the 1998 BDA.  (Al Reem's Mot., Siddiq Aff., 1998 BDA, Ex. 1 at ¶ 10.)

Second, the paragraph does not make sense.  The first sentence, a run-on, states, "[i]n consideration of the services of Al Reem General trading to be give as mentioned in this agreement Johns Hopkins Health System Corporation and subsidiaries partners commit themselves jointly and severally irrevocably and agree and undertake to pay Al Reem General Trading..." (Id.)  Third, language is used incorrectly, as in "remuneration fees in the amount of minimum [BLANK] of the total money received by Johns Hopkins or and value any paid services resulted from the scope of service or services rendered in U.A.E. or given to the First Party..." (Id.)

Finally, paragraph 10, the provision of the BDA dealing with compensation, is significantly different in the 1998 BDA from both the draft and final versions of the 1999 BDA.   (Id.; Hopkins' Opp'n Mem., Clark Aff., Draft BDA, Ex. A; Al Reem's Mot., Siddiq Aff., 1999 BDA, Ex. 2 at ¶ 10.) The 1998 BDA submitted to this court states that Al Reem will be paid an unstated minimum of the total money received or value obtained by Hopkins from services rendered in the U.A.E. or arranged by negotiation or contract.  (Al Reem's Mot., Siddiq Aff., 1998 BDA, Ex. 1 at ¶ 10.)   The U.A.E.

version states that this amount is five percent of the money received by Hopkins.  (Hopkins' Opp'n

Mem., Greenwald Aff., Ex. 1 at ¶ 10.)  In contrast, the draft 1999 BDA entitles Al Reem to five

percent of the money actually collected by Hopkins in Baltimore from patients referred by Al Reem.

(Hopkins' Opp'n Mem., Clark Aff., Draft BDA, Ex. A.)  The final 1999 BDA allots Al Reem ten

percent of the total charges collected by Hopkins from any citizen of the U.A.E.[4]  (Al Reem's Mot.,

Siddiq Aff., 1999 BDA, Ex. 2 at ¶ 10.)

    Due to the apparent inconsistencies and mistakes it observed in the 1998 BDA, Hopkins

submitted the document to a handwriting expert and was informed that the signature of Hopkins'

representative, John Hutchins, was a forgery and had "been produced by either tracing or simulation."

(Hopkins' Opp'n Mem., Clark Aff., Handwriting Report, Ex. B.)

    Al Reem contests Hopkins' allegations and maintains that it entered into two agreements with

Hopkins.  (Al Reem's Mot., Zarroug Aff. at ¶ 6.)  Al Reem asserts that about two years after the

business relationship was formed, the parties clashed over the sum of money owed to Al Reem for its

services.  (Al Reem's Mot., Siddiq Aff. at ¶ 11.)  Al Reem also contends that it attempted to settle the

dispute with Hopkins but was unsuccessful.  (Id.)  On July 29, 2000, Al Reem filed suit in the U.A.E.

against JHU, JHHSC, and JHI, seeking money for the services it had provided.  (Id. at ¶ 12.)

    The U.A.E. has a three-tiered federal court system that includes the Federal Courts of First

---

[4]It is curious that Al Reem believes it can enforce the 1998 BDA when the 1999 agreement
apparently narrowed the compensation allegedly agreed upon in the 1998 BDA.  While the 1998 BDA
provides that an unspecified "minimum" of the "total money" received by Johns Hopkins from U.A.E.
patients be paid to Al Reem, the 1999 BDA requires that any revenue attributable to U.A.E. patients
first be allocated to business development expenses incurred by Hopkins and then be divided equally
between Hopkins and Al Reem.

Instance, Federal Courts of Appeal, and a Federal High Court.  (<u>Id</u>. at ¶ 6.)  Al Reem describes the federal judiciary as independent, as guaranteed by the U.A.E. Constitution.  (<u>Id</u>. at ¶ 4.)  According to Al Reem, most of the judges who sit in three-judge panels in the Federal Courts of First Instance and the Federal Courts of Appeal have been educated in the United Arab Emirates, England, and Egypt. (<u>Id</u>.)  Many elements of Western legal thought are incorporated into U.A.E. commercial law.  (<u>Id</u>. at ¶ 5.)

Al Reem asserts that it served Hopkins twice over a period of about two years, but that Hopkins only answered the third notice in March 2003 via U.A.E. counsel.  (<u>Id</u>. at ¶ 13; Siddiq Aff., Summonses, Ex. 4.)  Al Reem notes that U.A.E. law requires that service of process be done three times before a party can move for a default judgment.  (Siddiq Aff. at ¶ 13.)  Hopkins filed a motion to dismiss the case because it maintains that under U.A.E. law, Al Reem was first obligated to exhaust its administrative remedies by filing a claim against Hopkins with the U.A.E. Commercial Agency Commission.  (Al Reem's Mot., Siddiq Aff., Hopkins' U.A.E. Reply, Exs. 5 and 6.)  The trial court denied Hopkins' motion on April 28, 2003.  (<u>Id</u>., April 28, 2003 Decision of the Court of First Instance, Ex. 7.)

The trial court appointed an Independent Accounting Expert in April 2003, to take evidence, review the case, meet the parties, and submit a report to the court with his suggestions and findings.[5] (<u>Id</u>.; Siddiq Aff. at ¶ 18.)  Hopkins attempted an interlocutory appeal to the U.A.E. Federal Court of Appeal, but it was dismissed on January 26, 2004 as it was not an appeal from a final judgment.  (Al

_____

[5]Hopkins notes that the expert does not call witnesses to testify and has no authority to compel document production.  (Hopkins' Opp'n Mem., Greenwald Aff. at ¶ 13.)

Reem's Mot., Siddiq Aff. at ¶¶ 20, 40.)

Al Reem claims that while the interlocutory appeal was pending, the Independent Accounting

Expert scheduled meetings with the parties, two of which Hopkins did not attend.  (Id. at ¶ 29.)  On

August 31, 2003, at the third session scheduled by the expert, Hopkins requested that the expert stop

his work until the interlocutory appeal was decided.  (Id. at ¶ 30.)  The expert rejected that request and

held two more meetings, one on September 21, 2003 and another on November 1, 2003.  (Id. at ¶¶

30, 33.)  On December 8, 2003, Hopkins submitted to the expert a response memorandum to all of Al

Reem's claims.  (Id. at ¶ 35; id., Memorandum of JHU, JHHSC, and JHI, Ex. 19.)  Al Reem contends

that after the interlocutory appeal was decided, the expert met with the parties on several occasions and

the trial court continued the case to allow the expert more time to finish his report. (Al Reem's Mot.,

Siddiq Aff. at ¶¶ 41-43; id., Report on Case Processing, Ex. 24.)  According to Al Reem's counsel at

oral argument, the expert's report will be submitted in the fall and the parties will then be given time to

review it and submit their comments to the expert and the court. Significantly, the expert is addressing

only damage issues and not the possibility of forgery.  In October 2004, Hopkins filed this suit seeking

a declaratory judgment that the 1998 BDA is invalid and damages for Al Reem's breach of its duties of

good faith and fair dealing relating to the 1999 BDA.

## I.

Al Reem has moved this court to dismiss this action on several grounds, including lack of

personal jurisdiction.  When a defendant challenges a court's personal jurisdiction under Fed. R.Civ.P.

12(b)(2), the burden rests ultimately with the plaintiff to prove, by a preponderance of the evidence,

grounds for jurisdiction.  See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390,

Case 1:04-cv-03286-CCB   Document 26   Filed 06/30/05   Page 9 of 21

396-97 (4th Cir. 2003). The court must resolve all factual disputes and make all reasonable inferences

in favor of the plaintiff. Id. at 396. This court may exercise personal jurisdiction over Al Reem, a non-

resident defendant, if: (1) jurisdiction is authorized under the long-arm statute of the forum state, and

(2) the assertion of jurisdiction comports with Fourteenth Amendment due process requirements. See

Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th

Cir.2001). The Maryland Court of Appeals has held that Maryland's long-arm statute is co-extensive

with the scope of jurisdiction permitted by the Fourteenth Amendment due process clause, and the

statutory and constitutional inquiries therefore merge in this case. See Carefirst, 334 F.3d at 396-97.

The Maryland long-arm statute, however, limits specific jurisdiction to cases where the cause of action

"aris[es] from any act enumerated" in the statute itself. Md.Code Ann., Cts. & Jud. Proc. §§ 6-

103(b)(1). Thus, a plaintiff must "identify a specific Maryland statutory provision authorizing

jurisdiction." Ottenheimer Publishers, Inc. v. Playmore, Inc., 158 F.Supp.2d 649, 652 (D.Md.2001);

see also Johansson Corp. v. Bowness Const. Co. 304 F.Supp.2d 701, 704 (D.Md. 2004).

 The plaintiffs rely on two provisions of Maryland's long-arm statute to assert personal

jurisdiction over the defendant.[6] First, under Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), this

court has personal jurisdiction over any person who "[t]ransacts any business or performs any

character of work or service in the State." This provision does not require the defendant to have been

---

[6]The plaintiffs' complaint asserts generally that personal jurisdiction exists by virtue of the
Maryland long-arm statute, Md. Cts. & Jud. Proc. Art. § 6-103, see Compl. ¶ 7, while their
memorandum in opposition to Al Reem's motion to dismiss specifically identifies two provisions within
the Maryland long-arm statute. (Hopkins' Opp'n Mem. at 18-19.) This satisfies their duty to identify
the statutory provisions which authorize personal jurisdiction over the defendants in this case. See
Johansson Corp., 304 F.Supp. 2d at 704 n.1.

physically present in Maryland.  <u>Bahn v. Chicago Motor Club Ins</u>., 634 A.2d 63, 67 (Md. 1993).

Rather, what is required are actions by the defendant that "culminate in purposeful activity within the

state." <u>Id</u>. (defendant transacted business in the state by sending notices to plaintiffs in Maryland,

contracting with them there, and receiving payments sent from Maryland); <u>see also</u> <u>Jason</u>

<u>Pharmaceuticals, Inc. v. Jianas Brothers Packaging Co.</u>, 617 A.2d 1125, 1129 (Md. 1993)(purposeful

activity found where the parties negotiate over the phone but enter into a contract and exchange a

downpayment in Maryland).

      That Al Reem is not registered to do business in Maryland and does not have an office here is

immaterial.  Similarly, Al Reem's contention that most of the work it performed was in the U.A.E. is

unavailing.  The record indicates that Al Reem representatives initiated contact with Hopkins

representatives in Baltimore, came to Maryland to meet Hopkins representatives on several occasions,

and entered into a contract in Maryland.  <u>See</u> <u>Giannaris v. Cheng</u>, 219 F.Supp.2d 687, 692-93

(D.Md. 2002)(defendant's initiation of business relationship was deemed substantial connection to the

forum state).  During the course of the business relationship, Al Reem referred patients to treatment in

Baltimore, communicated extensively with Hopkins representatives in Baltimore, and received

payments for their services from Baltimore.

      Second, the plaintiffs rely on a provision of the Maryland long-arm statute which provides for

jurisdiction over someone who "[c]ontracts to supply goods, foods, services, or manufactured products

in the State."  Md. Code, Cts. & Jud. Proc. § 6-103(b)(2).  Because Al Reem contracted with

Hopkins to supply a service, referral of patients from the U.A.E. for treatment at Hopkins in Baltimore,

it falls under this provision of the long-arm statute as well.

Inasmuch as Al Reem's visits and connections to Maryland amount to at least minimum contact and it does not "offend traditional notions of fair play and substantial justice" to exercise jurisdiction over Al Reem here, the assertion of personal jurisdiction comports with due process.  International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945) (citation omitted).


II.

Al Reem argues that even if this court has jurisdiction over this suit, the action should be dismissed based upon principles of international comity.  International comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under protection of its laws." Hilton v. Guyot, 159 U.S. 113, 164, 16 S.Ct. 139, 164 (1895); see also In re French, 320 B.R. 78, 85 (D. Md. 2004).  This respect for a foreign forum's acts is not mandated by law but is born of practice, convenience, and expediency.  45 Am. Jur.2d International Law § 7; In re French, 320 B.R. at 85 (international comity is not "a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other.")  Also, the comity doctrine only suggests recognition of a foreign proceeding if it is "determined to be orderly, fair, and not detrimental to the nation's interests."[7]  Basic v. Fitzroy Engineering, Ltd., 949 F.Supp. 1333, 1340 (N.D. Ill., 1996), aff'd, 132 F.3d 36 (7th Cir. 1997)(quoting Pravin Banker Assocs., Ltd. v. Banco Popular del Peru, 165 B.R. 379, 384 (S.D.N.Y. 1994)).  The laws of the foreign court do not need to

---

[7]When the foreign action is pending and not decided, comity advises that priority go to the suit filed first.  Basic, 949 F.Supp. at 1340 (citation omitted).

be identical to American laws for a court to defer the matter to the foreign court.  <u>Zinsler v. Marriott</u>

<u>Corporation</u>, 605 F.Supp. 1499, 1506 (D.Md. 1985).

The more common abstention dilemma faced by federal courts is when there are parallel state

court proceedings.  <u>Colorado River Water Conservation District v. United States,</u> 424 U.S. 800, 96

S.Ct. 1236 (1976), set out the factors often relied upon by district courts in making the decision

whether to refrain from exercising jurisdiction in deference to an ongoing state suit.  <u>Id</u>. at 817-19.

Courts have applied those same factors in cases where there are concurrent federal and foreign

proceedings.[8]   The <u>Colorado River</u> factors include: (1) which forum first assumed jurisdiction over the

property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation;

and (4) the order in which jurisdiction was obtained by the concurrent forums.  <u>Id</u>. at 818.  The Fourth

Circuit also takes into account: (5) the source of governing law; and (6) whether the foreign

proceedings are adequate to protect the parties' rights.[9]  <u>Gannett Co., Inc., v. Clark Construction</u>

<u>Group, Inc</u>., 286 F.3d 737, 741 (4th Cir. 2002); <u>Al-Abood ex rel. Al-Abood v. El-Shamari</u>, 217 F.3d

225, 232 (4th Cir. 2000).  All the factors must be contemplated collectively in making an abstention

_____

[8]Some recent cases have noted that the federalism and federal supremacy concerns in a parallel
federal and state court proceeding scenario are different from the international relations and comity
issues involved in concurrent federal and foreign court proceedings.  <u>See</u> <u>Posner v. Essex Insurance</u>
<u>Co., Ltd.</u>, 178 F.3d 1209, 1223 (11th Cir. 1999).  While this distinction may influence how readily a
court will abstain in the two varying situations, <u>Colorado River</u> would apply in either event.

[9]Al Reem lists factors that have been used by other courts to determine whether to dismiss or
stay because of a parallel litigation in a foreign court.  <u>See</u> <u>Caspian Investments, Ltd. v. Vicom</u>
<u>Holdings, Ltd.</u>, 770 F.Supp. 880, 884 (S.D.N.Y. 1991); <u>Continental Time Corp. v. Swiss Credit</u>
<u>Bank</u>, 543 F.Supp. 408, 410 (S.D.N.Y. 1982).  As the cases cited by Al Reem are not from this
circuit, the cited factors are not binding on this court.  Also, the factors are similar to, or overlap with,
the <u>Colorado River</u> factors.

decision, Colorado River, 424 U.S. at 818-819, "with the balance heavily weighted in favor of the exercise of jurisdiction." Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 16 (1983). In fact, abstaining on Colorado River grounds "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Chase Brexton Health Services, Inc. v. State of Maryland ___ F.3d ___, 2005 WL 1356437 (4th Cir. 2005) (quoting Colorado River, 424 U.S. at 813.)

When the foreign proceeding is a declaratory judgment action, a more liberal "discretionary" standard is applied. Wilton v. Seven Falls Co., 515 U.S. 277, 283-286, 115 S.Ct. 2137, 2140-2142 (1995). In applying this standard, additional factors are considered, including: (1) the scope of the pending parallel proceeding; (2) the nature of the defenses open there; (3) whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding; and (4) whether the parties are amenable to process in that proceeding. Id. at 283.

Before a court may weigh the various factors enumerated under either the "discretionary" or the "exceptional circumstance" standard, it must first decide whether there are parallel suits. Al-Abood, 217 F.3d at 232. Al Reem asserts that suits are deemed parallel "if substantially the same parties are litigating substantially the same issues in different forums." New Beckley Mining Corp. v. International Union, UMWA, 946 F.2d 1072, 1073 (4th Cir. 1991). Hopkins, however, contends that the Fourth Circuit has held that to be "parallel," the two suits must be duplicates. McLaughlin v. United Virginia Bank, 955 F.2d 930, 931 (4th Cir. 1992).

The court will assume without deciding that the two proceedings are parallel as Al Reem suggests. It must next perform the Colorado River inquiry. First, the U.A.E. courts assumed

jurisdiction over this matter prior to this court. Hopkins never objected to the U.A.E. court's

jurisdiction and has participated in the proceedings there. Hopkins' participation, however, reflects its

misgivings relating to the U.A.E. judicial system. Most significantly, Hopkins did not participate in the

suit until it was at risk of having a default judgment imposed against it. Thus, its participation may not

be relied upon, as Al Reem does, to suggest that Hopkins embraced the U.A.E. court's jurisdiction.

Second, the federal forum is obviously more convenient for Hopkins and the individuals who

represented Hopkins in the formation of the business relationship with Al Reem, most notably Hutchins,

the purported signatory. The court finds that the forum is not inconvenient for Al Reem, particularly in

light of the frequent trips taken by Al Reem representatives to the United States and the evidence

presented that Manar Zarroug owns a residence in California.[10]   (See Hopkins' Mot. to File Sur-Reply,

Phone Book Entry and New Planning Application, Ex. 1; Travel Logs and Invoices, Ex. 2.)

Third, the Fourth Circuit has held that for a court to abstain to avoid piecemeal litigation,

"retention of jurisdiction must create the possibility of inefficiencies and inconsistent results beyond

those inherent in parallel litigation, or the litigation must be particularly illsuited for resolution in duplicate

forums." Gannett, 286 F.3d at 744. See also Chase Brexton Health Services Inc., __F.3d__, 2005

---

[10]In the U.A.E. proceedings, Al Reem submitted claims for reimbursement by Hopkins for at
least fourteen trips to the United States by Captain Zarroug. (Hopkins'Mot. for Leave to File Sur-
reply at 2; id., Travel Logs and Invoices, Ex. 2.) This evidence was not intended to show the most
recent travels by Al Reem's representatives to the United States, but were submitted to the U.A.E.
courts to claim reimbursement from Hopkins for the expenses. Once the business relationship between
the parties ended, Al Reem could no longer claim travel expenses. That does not mean, however, that
the Zarrougs and other Al Reem representatives have not come to the United States. As indicated by
defense counsel during oral argument, Osias, an alleged witness to the signing of the 1998 BDA, is
currently living in California and Manar Zarroug visits her on a regular basis.

WL 1356437 at 13 ("The threat of piecemeal litigation in the sense that two cases proceed simultaneously thus is not sufficient to support a decision to abstain under <u>Colorado River</u>.").  As there are no particular inefficiencies mentioned by either party beyond those inherent in parallel litigation, abstention is not appropriate on these grounds.

Fourth, the U.A.E. court obtained jurisdiction prior to this court.  Hopkins persuasively argues, however, that the U.A.E. court should not be given priority based on the fact that a complaint was filed there first.  As the Supreme Court has noted, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." <u>Moses H. Cone</u>, 460 U.S. at 21; <u>Gordon v. Luksch</u>, 887 F.2d 496, 498 (4th Cir. 1989).  <u>See also</u> <u>Chase Brexton</u>  __F.3d__ 2005 WL 1356437 at 13 (finding under both the fourth and sixth <u>Colorado River</u> factors that evidence of the slow pace of parallel state proceedings weighed against federal abstention).  There has been no judicial action on the forgery issue in the U.A.E. proceeding, and, therefore, there is no obvious reason for this court to cede its jurisdiction.

Fifth, the conflicts of laws rules applied in this court are those that prevail in Maryland's state courts.  <u>Klaxon v. Stentor Electric Mfg. Co.</u>, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021 (1941).  Maryland applies the law of the place where the contract was made.  <u>Baker v. Sun Co., Inc., (R&M)</u>, 985 F. Supp. 609, 611 (D. Md. 1997).  A contract is "considered to be 'made' where the last act necessary for the formation of a binding contract is performed." <u>Id</u>.; <u>Mallinckrodt, Inc. v. Whittaker M.A. Bioproducts, Inc</u>., 566 A.2d 1113, 1116 (Md. 1989).  The undisputed contract, the 1999 BDA, was notarized in Washington, D.C. on March 3, 1999.  Thus, D.C. law applies to the business relationship, making this court a more suitable forum as it is more familiar with D.C. law.

Finally, this court is not convinced that the U.A.E. proceedings are adequate to protect the parties' rights. The U.A.E. court has not even addressed the forgery issue yet; it has spent almost two years assessing the damages incurred by Al Reem. When it does consider the evidence relating to the alleged forgery of the 1998 BDA, the relevant documents will be translated into Arabic. Though an American court would readily spot the grammatical and other differences between those portions of the 1998 BDA and the rest of the documents between Al Reem and Hopkins, the significance of that bad grammar and writing may be overlooked in the translation. Even if Hopkins' U.A.E. attorneys could explain the grammatical and other problems with the text, the analysis would be easier for a native English speaker to perform. Moreover, given that the Zarrougs and Osias, the main Al Reem witnesses, all speak English, the language barrier will not be as great in this court.[11]

### III.

*Forum non conveniens* is another doctrine that permits dismissal of a case by this court in "rare cases." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509, 67 S.Ct. 839, 843 (1947). The court makes the *forum non conveniens* determination after balancing the public and private interest factors set out in Gulf Oil , 330 U.S. at 508 and Piper Aircraft Company v. Reyno, 454 U.S. 235, 257-259, 102 S.Ct. 252, 267-68 (1981). The relevant private interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; and (4) other practical problems

---

[11]Al Reem relies on Meisel v. Ustaoglu, 2000 WL 33374486 (D. Md. 2000), an unreported opinion that dismissed a case from this court in the interest of international comity. The Meisel case is distinguishable because the plaintiffs were the same in both the foreign and federal courts, the original documents were written in a foreign language, and the witnesses were willing to travel abroad.

involving efficiency and expense of trial.  See Gulf Oil, 330 U.S. at 508-509.  The public interest

factors consist of the: (1) administrative difficulties flowing from court congestion; (2) local interest in

having localized controversies decided "at home;" (3) interest in having the trial of a diversity case in a

forum that is familiar with the law that must govern the action; (4) avoidance of unnecessary problems in

conflict of laws, or in the application of foreign law; and (5) unfairness of burdening citizens in an

unrelated forum with jury duty.  Id.

       Hutchins, the principal witness regarding the forged 1998 BDA, is available in Baltimore but

cannot be compelled to appear in the U.A.E. courts.  Even if Hutchins would come willingly to the

U.A.E., a matter of dispute between the parties, witnesses do not generally testify orally in the U.A.E.[12]

(Greenwald Aff. at ¶ 11.)  Besides Hutchins, the other likely witnesses for Hopkins are Ruthy (Feltrin)

Khawaja who worked with Hutchins and currently lives in Texas, and the handwriting expert retained

by Hopkins, who is also available to testify in this district.  (App. to Hopkins' Opp'n, Ex. 6, Khawaja

Aff.; Hopkins' Opp'n Mem., Clark Aff., Ex. B, May 2002 Handwriting Expert Letter.)  As for other

sources of proof, Hopkins has the draft BDAs and other correspondence in their files in Baltimore,

readily available to this court.  Any evidence that Al Reem has related to the forgery could be presented

in this court but would remain unavailable to Hopkins in the U.A.E. as there is no discovery in that

_____

       [12]Hopkins maintains that Hutchins could be detained in the U.A.E. as a material witness for
months at a time.  (Greenwald Aff. at ¶ 16.)  Alternatively, Hopkins notes that angry businessmen in the
U.A.E. have been known to turn a commercial dispute into a criminal charge, "and the police authorities
are often quick to detain those accused of 'wrongdoing,' especially if they are not residents."  (Id.)  Al
Reem asserts that witnesses are not only not at risk but are protected by the court.  (Al Reem Reply,
Second Siddiq Aff. at ¶¶ 7, 8.)

court.[13]

Al Reem argues that most of the witnesses to the 1998 BDA and the registration and performance of the two agreements are U.A.E. citizens.  In oral arguments, Al Reem indicated that their witnesses for the forgery issue include Osias, Captain Zarroug, Manar Zarroug, and other attendees of a dinner with Hutchins.  Al Reem's counsel argued that it would be costly and burdensome, especially due to tightened security, for Al Reem's witnesses to travel to Baltimore to testify in this case.  As discussed previously, the court is not persuaded that it would be onerous to expect Al Reem's representatives or principal witnesses to travel, particularly in light of Osias and Manor Zarroug's residence in California.[14]

As for other practical problems, it is inefficient to determine damages abroad before reaching a decision on liability.  Moreover, it is inefficient to litigate these facts from afar in another language, without the benefits of discovery or live testimony from the purported signatory.  Hopkins has spent significant time and money in over two years of litigating what it reasonably considers may be an obvious forgery to "any fair-minded person whose native tongue is English."  (Hopkins' Opp'n at 32.)

On the public interest side of the equation, Al Reem maintains that the U.A.E. has a strong local interest in the dispute because it involves contracts that were performed in the U.A.E. and involved a

---

[13]Al Reem explains that most foreign courts do not provide for the same breadth of discovery as American courts and therefore, the focus is not on how similar the system is to American law but whether the foreign court satisfies due process requirements.  Also, Al Reem asserts that while there is no discovery in the U.A.E., a party could ask the U.A.E. court to compel its adversary to produce documents.  This does not completely resolve this issue as Hopkins may not know which specific documents to request.

[14]Al Reem's counsel informed the court that Captain Zarroug is currently hospitalized in the U.A.E.  Presumably, if he is well enough, Captain Zarroug could be deposed in the U.A.E.

citizen of the U.A.E. and a foreign party that had an office there.  Thus, Al Reem asserts that U.A.E.

law applies and that U.A.E. courts are more familiar with that law.  Citing <u>Zinsler</u>, Al Reem notes that

the *forum non conveniens* doctrine has had particular vitality when the more convenient forum is a

foreign country.  605 F.Supp. at 1504.  Finally, Al Reem contends that if Hopkins were truly

concerned about litigating the case in the U.A.E., it should have done something about it in March

2003, not in October 2004.

Hopkins argues that as the plaintiff in this suit, its choice of forum is entitled to deference.  <u>See</u>

<u>Piper Aircraft Co.</u>, 454 U.S. at 255; <u>Koster v. (American) Lumbermens Mut. Cas. Co.</u>, 330 U.S.

518, 524, 67 S.Ct. 828, 832 (1947); <u>General Motors Corp. v. Ignacio Lopez de Arriortua</u>, 948

F.Supp. 656, 668 (E.D. Mich. 1996)("a United States citizen should not be deprived of his choice of

forum except when the trial would prove oppressive and vexatious to defendant, out of all proportion to

the convenience to plaintiff") (citation omitted).  Generally, the inconvenience to a defendant is

outweighed by a showing of convenience by the plaintiff.  <u>See</u> <u>Koster</u>, 330 U.S. at 524.  Hopkins

contends that another public interest factor, having a forum at home with the governing law, supports

litigating in this district because Hopkins maintains that D.C. law applies to this suit.  Hopkins thus

contends that there is no problem with conflict of laws because there is no need to apply foreign law.

Finally, Hopkins requests a jury trial– which is available in this court and not in the U.A.E. court.  These

factors weigh in favor of exercising jurisdiction.

IV.

Alternatively, Al Reem requests a stay of this proceeding until after a final judgment has been

reached in the U.A.E. courts.  Al Reem asserts that  the court may then determine whether Hopkins has

had the benefit of full due process and fair treatment.  In the meantime, Al Reem insists that a stay would avoid litigating this matter piecemeal, prevent the possibility of having inconsistent verdicts, and thwart any forum-shopping motive that may exist.

However, this court has the "virtually unflagging obligation" to exercise its jurisdiction and abstention is only appropriate in rare cases.  Colorado River, 424 U.S. at 817-18; Gannett, 286 F.3d at 741.  This court has previously held that "exceptional circumstances are required to support *either a stay or a dismissal* of the federal action....a stay is as much a refusal to exercise federal jurisdiction as a dismissal."  United States v. SCM Corp., 615 F.Supp. 411, 417 (D. Md. 1985).  The general rule is for federal courts to "exercise jurisdiction concurrently with a foreign court until a judgment is reached which may be pled as res judicata or collateral estoppel in the other forum."  Abdullah Sayid Rajab Al-Rifai v. McDonnell Douglas, 988 F.Supp.1285,1293 (E.D. Mo. 1997) (citing General Motors Corp., 948 F.Supp. at 669).

This court is loathe to issue a stay, particularly because of the delay in the U.A.E. court and its failure to address Hopkins' forgery concerns.  The court finds it curious that the U.A.E. court is determining damages before it has considered whether Hopkins is, in fact, liable.  In addition, if this court issues a stay and Hopkins receives an erroneous judgment against it in the U.A.E., Al Reem has vowed to use that judgment in courts in other locations.[15]   In Captain Zarroug's letters to John Hutchins, he wrote:

> [M]y tactic is to win the case in the United Arab Emirates and then to
> sue again in the United States.  I am not going to stop.  I am going to

---

[15]The judgment against Hopkins in the U.A.E. could potentially be for tens of millions of dollars.

> sue left and right.  I was born a fighter and I am taking definite actions.
> I cannot afford to lose.  Therefore, I am sure 100 percent I will win the
> case in United Arab Emirates.
>
> I will attack them in the States but that is after I have won the case in
> United Arab Emirates, Singapore, London and then eventually I will
> come to the States.

(Hopkins' Appx to Mem, July 3, 2003 Zarroug Letter, Ex. 8.)  Confident about Al Reem's likely

success in the U.A.E., Captain Zarroug explained:

> The systems [sic] of the courts in Abu Dhabi are different from those in
> the United States.  For this reasons [sic], I want to win the case in Abu
> Dhabi and thereafter, I will move the case to London, Singapore, USA
> and any other place you may suggest.

(Id., July 7, 2003 Zarroug Letter, Ex. 9.)  Though Captain Zarroug's letters may have been written in

the heat of passion, they are accurate in that Al Reem potentially could use a U.A.E. judgment to

support a  "worldwide assault."

For all the reasons stated above, Al Reem's motion to dismiss or stay will be denied and

Hopkins' motion for leave to file a sur-reply memorandum in opposition to Al Reem's motion will be

denied as moot.  Discovery may begin immediately directed at the validity of the 1998 BDA.

A separate order follows.


___June 30, 2005_____                          _____/s/_____
Date                                           Catherine C. Blake
                                               United States District Judge


21